
UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| RONDA M. HERMAN | * | CIV. 12-5014 |
| Plaintiff, | * | |
| -vs- | * | REPORT and RECOMMENDATION |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff, Ronda M. Herman ("Herman") seeks judicial review of the Commissioner's final decision denying her a period of disability commencing on June 18, 2008, and payment of disability insurance and medical benefits under Title II and/or Title XVI of the Social Security Act.[1] Herman has filed a Complaint and has requested the Court to enter an order instructing the Commissioner to remand her case back to the agency pursuant to 42 U.S.C. § 405(g) sentence four, for further consideration. The matter is fully briefed and has been referred to the Magistrate Judge for a Report and Recommendation. For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED AND REMANDED for further consideration.

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon his "coverage" status (calculated according to his earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.

In this case, Herman filed her application for both SSD/DIB and SSI benefits. She protectively filed her application for both types of benefits on September 19, 2008. AR 151. Herman's "date last insured" for SSD/DIB ("Title II") benefits is December 31, 2013. *See* AR 127.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g). Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and Judge Schreier's Standing Order dated March 18, 2010.

## ADMINISTRATIVE PROCEEDINGS

Herman protectively filed her application for benefits on September 19, 2008.[2] AR 151, 113-117. In an undated form entitled "Disability Report–Adult" she filed in connection with her 2008 disability application (AR 154-161) Herman listed the following as illnesses, injuries or conditions that limited his ability to work: "arthritis, tendonitis, back problems, borderline diabetic." AR 155. She explained that these conditions limit her ability to work in the following ways: "can't lift much weight, body was unable to handle varied hours, back/neck hurts, problems sleeping." *Id.*

Herman's claim was denied initially February 3, 2009 (AR 57-60), and on reconsideration on May 4, 2009 (AR 64-65). She requested a hearing (AR 69-70) and a hearing was held on June 16, 2010, before Administrative Law Judge (ALJ) the Honorable James Olson. AR 29-51. On September 24, 2010, the ALJ issued a ten page, single-spaced decision affirming the previous denials. AR 19-28. On November 16, 2010 Herman requested a review of the ALJ's decision by the Appeals Council. AR 15.[3] The Appeals Council received as additional evidence: treatment notes from the Kyle Health Center dated August 24 and October 25, 2010 (AR 265-67) and Ms. Ratliff's brief (AR 205-214). The Appeals Council denied review of Herman's claim on January 30, 2012. AR 1-3. Herman then timely filed a Complaint in this Court.

---

[2]The protective filing date is the date a claimant first contacts the Social Security Administration about filing for benefits. It may be used to establish an earlier application date than when the Administration receives the signed application. *See* http://www.ssa.gov/glossary.htm

[3]Herman was un represented at the hearing level, but present counsel became involved at the Appeals Council level of the proceedings. AR 7.

## FACTUAL BACKGROUND

Ronda Herman was born in 1955 and was fifty-five years old at the time of the administrative hearing. AR 35.[4] She graduated from high school and has an associate's degree in general studies. *Id.*

In the last fifteen years, Herman has worked as a cashier at a casino, a rental agent, a placement specialist, and a case aide. AR 36.[5] She quit working because, as she described it, her arthritis is getting worse and she is "stiffening up." *Id.* Herman described pain from her "head to her toes" for which she has received cortisone injections. The pain primarily affects her hips and shoulders. AR 36. She described the pain as constant. AR 37. One of her physicians told her it is a form of rheumatoid arthritis. *Id.* Although one of her physicians opined she was born with the condition, Herman attributed her ongoing problems to a serious motor vehicle accident which occurred in October, 1979. AR 37. That accident resulted in a fractured back, hip and pelvis. AR 37-38.

### Medical Conditions and Treatment[6]

The medical records which appear in the administrative records are summarized by provider.

---

[4]Pursuant to 20 C.F.R. Pt. 404 Subpt. P. App. 2, Medical Vocational Guidelines, § 201.00(f), Herman was "advanced age" (55 or older) on the date of her administrative hearing. On her date of alleged onset (June 18, 2008) she was "approaching advanced age." 20 C.F.R. Pt. 404 Subpt. P. App. 2, Medical Vocational Guidelines, § 201.00(g).

[5]It appears from documents in the record that were completed by Herman that her employer for each of these positions was the Oglala Lakota Sioux Tribe. Herman worked for the Department of Social Services, the Housing Authority, and the Food Stamp Distribution Center before her final employment with Prairie Wind Casino. AR 200.

[6]Herman is a member of the Oglala Lakota Sioux Tribe. As such, she receives her medical care in Kyle, South Dakota, from an Indian Health Services clinic which is within the Pine Ridge Reservation. In her opening brief, Herman's counsel detailed the well-documented limitations of the IHS provided medical care available on the Pine Ridge Reservation, which contributed to Herman's lack of medical treatment. Among the documented problems noted in Herman's brief are: difficulty recruiting and retaining physicians, the lack of access to specialists such as physical therapists and orthopedists, and the lack of funding available to provide anything except "priority care," defined as medical care to prevent immediate death or serious impairment to health or potentially grave outcomes. *See generally* Herman's opening brief (Doc. 14) and published articles cited at pp. 2-4.

1.    **Rapid City Regional Hospital (10/79)[7]**

There is an operative report dated October 6, 1979 in the record from Rapid City Regional Hospital, along with a letter dated October 8, 1979, from Dr. Andrew Yamada. AR 253-255. Dr. Yamada explained that Herman was seen in the emergency room and was then followed by surgeon Dr. Van Etten and orthopedist Dr. Kullbom. AR 255.

The operative note (AR 253-254) explains Herman's post operative diagnosis: ruptured bladder, pelvic fractures, small spleen and liver lacerations, cirrhosal tear of the cecum, mesentery hematomas of the large and small bowels, and a scalp laceration. AR 253.

2.    **Emergency Room Indian Health Services–Pine Ridge–10/79-10/01**

On October 6, 1979, Herman was brought to the Emergency Room at Pine Ridge after being in a motor vehicle accident in which she was "trapped under the console." AR 251. She sustained a pelvic crushing injury. AR 252. X-rays revealed a pubic symphysis separation, SI joint separation and fractured pubic ramus and ischial ramus and questionable fracture of the left acetabulum. Herman was stabilized in the emergency room and transferred to Dr. Yamada in Rapid City. AR 252.

Herman was seen in the Emergency room at Indian Health Services in Pine Ridge on October 30, 2001. AR 248. She complained of right hip pain after having been in a motor vehicle accident in which another driver ran a red light. The provider diagnosed musculoskeletal pain and prescribed

---

[7]These records pre-date Herman's alleged date of onset. The Social Security regulations require the Commissioner to consider all evidence submitted by a claimant when making the disability determination. 20 C.F.R. § 404.1520(a)(3). While medical evidence which predates the alleged date of onset "is of little relevance" *Carmickle v. Commissioner of Social Security Administration*, 533 F.3d 1155, 1165 (9th Cir. 2008), failure to consider it at all may be reversible error. *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008). Medical records which pre-date the alleged date of onset are properly considered not for the purpose of determining whether Herman is disabled during the relevant time period, but to provide a more accurate understanding of her medical background. *See e.g. Walker v. Astrue*, 2012 WL 369453 at *1 (S.D. W.Va.).

Tylenol #3.[8]  *Id.*

### 2.    Indian Health Services Kyle Health Center (Various Providers) 10/79-10/10

There is a note dated October 6, 1979 (the date of Ms. Herman's motor vehicle accident) in the Kyle Clinic records. AR 250. It is not clear, however, that she was seen in the clinic on that date. The records are not legible. They appear to refer to several fractures and that Herman was referred to Dr. Yamada in Rapid City.  *Id.*  Herman received her pain medication from the clinic in November and December of 1979.  *Id.*

Herman appeared at the Kyle Clinic on February 6, 1990 for a check up on her arthritis. AR 249. She complained of tenderness in her right hand and hip "since this weather." The practitioner noted Herman's hip fracture in 1979 and noted Herman's hands were mildly swollen "on IP joints." Motrin was prescribed, and it appears an x ray and a test for rheumatoid arthritis were requested. *Id.*

Herman presented to the Kyle Clinic on April 2, 2002 requesting pain medication for arthritis. AR 241. She complained of right-sided hip pain. She reported an active life style but "hurts all day." *Id.* The provider diagnosed hip/back pain and prescribed Motrin[9] and moist heat. *Id.*

Herman presented to the Kyle Clinic on June 30, 2005. Her chief complaint was left arm pain. She denied any recent trauma. AR 239. During this visit she recounted her history of a motor vehicle accident 20 years ago with recurring pain since then. *Id.* The provider's diagnosis was left elbow tendinitis, chronic right hip and back pain. Herman received a prescription for Motrin and a referral for physical therapy.

---

[8]Tylenol # 3 is Tylenol with Codeine. It is a narcotic analgesic which is indicated for the relief of mild to moderately severe pain. www.rxlist.com

[9]Motrin is a non-steroidal anti-inflammatory indicated for the signs and symptoms of rheumatoid arthritis and osteoarthritis as well as the relief of mild to moderate pain. www.rxlist.com

Herman presented to the Kyle Clinic on March 23, 2006. AR 238. Her chief complaint was right shoulder pain. She indicated right shoulder pain for four months with no specific injury. She could not raise her arm. *Id.* The medical provider observed decreased range of motion and muscle spasms in the right arm. A request was made for x-rays of the right arm. The diagnosis was chronic tendinitis and frozen shoulder. Herman received prescriptions for Motrin, Ben Gay and another medication which is illegible in the record. AR 238. She received an injection of Depomedrol[10]/Xylocaine[11] into her right shoulder, along with a referral to physical therapy. *Id.*

There is a note from the physical therapist (El Sayed El Fallal) dated March 28, 2006. AR 247. The therapist noted Herman's chief complaint of a frozen right shoulder. *Id.* The therapist noted limited range of motion and pain in the right shoulder. The goal of his treatment was a functional and mobile right upper extremity. The short term goal was to reduce pain and swelling and increase the range of motion in Herman's right shoulder. *Id.* The physical therapist planned to treat Herman every other day for two weeks. *Id.* The diagnosis was "frozen right shoulder." *Id.*

Herman presented to the Kyle Clinic on May 26, 2006. AR 237. Her chief complaint was a painful right shoulder/frozen shoulder. She reported she'd done physical therapy "until PR terminated PT." *Id.* The provider diagnosed chronic tendinitis/frozen shoulder. There is a note about a "joint injection" but it is unclear whether the injection was performed on this date. Motrin and home exercises were prescribed. *Id.*

Herman presented to the Kyle Clinic on January 16, 2007. Her chief complaint was shoulder pain which she rated at 7/10. AR 236. The medical provider diagnosed shoulder pain and multiple

---

[10]Depo Medrol is an anti-inflammatory glucocorticoid for intramuscular, intra-articular, soft tissue or intralesional injection. www.rxlist.com

[11]Xylocaine is a local anesthetic administered parenterally by injection. It is indicated for the production of local or regional anesthesia . . by peripheral nerve block techniques. www.rxlist.com

arthralgias. *Id.* Motrin and Tramadol[12] were prescribed, along with physical therapy for the shoulder pain. AR 236.

Herman presented at the Kyle Clinic on September 28, 2007. AR 224. She rated her pain as a 4/10 on that day. *Id.* Her chief complaints were right shoulder and bilateral wrist and hip pain. *Id.* She described the pain as "chronic." Much of the remainder of this treatment not is not legible, but it appears the provider wrote prescriptions and advised Herman to perform range of motion ("ROM") exercises as tolerated. *Id.*

Herman presented at the Kyle Health Center on April 1, 2009 with a chief complaint of arthritis pain. AR 234. She was supposed to see Dr. Livermont but for reasons which do not appear in the record, she left without being seen. *Id.* She returned again on April 2, 2009. AR 235. She again complained of arthritis pain. She also reported a "frozen shoulder." *Id.* Again much of the note is not legible, but it appears the provider diagnosed adhesive synovitis on the right shoulder and prescribed Ibuprofen and physical therapy or another steroid injection. AR 235.

Herman presented at the Kyle Clinic on June 18, 2010 with symptoms of "severe incapacitating skin pain." AR 263. She also complained of back, neck, shoulder, leg and foot pain, and numbness in her hands and legs. AR 263. She also had "stiffness" in her toes. She explained that she'd had back pain for "years" and that her twin brother had rheumatoid arthritis. *Id.* The note indicates that in the past, Dr. Livermont diagnosed adhesive capsulitis of the left shoulder. The provider noted muscle spasms of both trapezius muscles and "very tender to touch almost everywhere on her body subluxed bilateral SI joints." AR 263. He also noted " hyperethesias throughout body C8 nerve root compression tenderness both upper ext. heel and toe walk well area of paresthesia to pin prick of medial right foreleg anteriorly from submetaphysis of tibia to middle of foreleg then pinprick sensation returns." The provider's (Doug Morgan, physician's assistant) diagnosis was: fibromyalgia, seborrheic  keratosis, bilateral sciatica, marasma face, and

---

[12] Tramadol is the generic name for Ultracet. It is indicated for the short-term management of acute pain. www.rxlist.com

cholelithiasis. He referred Herman to a surgeon for her cholelithiasis[13] and prescribed Gabapentin,[14] "exercises and back maintenance." AR 264.

Herman was seen at the Kyle Health Center on June 21, 2010 for muscle spasms, neck and shoulder pain. AR 261. The physician's assistant noted Herman was on Gabapentin but was not yet at a therapeutic level. He also noted Herman has "adhesive capsulitis of the right shoulder, neck spasm, and probable fibromyalgia . . ." Bilateral spasms of the trapezius were also noted. *Id.* Diazepam[15] and Flexeril[16] were prescribed.

On August 24, 2010, Herman returned to the Kyle Clinic. AR 265. She had a dental infection on the right side of her face. The nurse practitioner noted Herman's history of fibromyalgia and muscle spasms. Herman requested a repeat "Valium injection." *Id.* Herman returned to the clinic on October 25, 2010, again requesting pain medication and a pain shot. AR 267. The provider assessed fibromyalgia, bilateral sciatica, bilateral frozen shoulders, and cholelithiasis.[17] A prescription for Phenergan[18] was given, along with an increase in Neurontin.

---

[13]Cholelithiasis is the presence or formation of gallstones in the gallbladder or bile ducts. http://medical-dictionary.thefreedictionary.com/cholelithiasis

[14]Gabepentin is the generic name for Neurontin. It is indicated for the management of neuralgia in adults. www.rxlist.com

[15]Diazepam is the generic name for Valium. It is a benzodiazepine derivative and is indicated for the relief of skeletal muscle spasm due to reflex spasm to local pathology such as inflammation of the muscles or joints, or secondary to trauma. www.rxlist.com.

[16]Flexeril is a muscle relaxant indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute, painful musculoskeletal conditions. www.rxlist.com

[17]The provider noted Herman was scheduled for surgery for the gallstones on November 4th. AR 267. Recall Herman was referred to a surgeon in June. AR 264.

[18]Phenergan is indicated for the prevention and control of nausea. www.rxlist.com

### 3. Pine Ridge Human Services (Amanda Lessert, Physical Therapist) 4/09

Herman called Pine Ridge Human Services on April 15, 2009 complaining of left shoulder pain. AR 233, 244. Herman had a referral from the Kyle Health Clinic for a shoulder sling. Although the note indicated Herman was "issued, fitted and instructed in the safe use of" the shoulder sling, the note also indicates that the sling was issued to Herman's brother because she could not make it to the clinic during working hours. *Id.*

### 4. Pine Ridge Hospital (Dr. Watson, Orthopedic Surgeon) 5/09

Herman was evaluated by Dr. Watson, an orthopedic surgeon on an outpatient basis on May 5, 2009. AR 243, 259. Dr. Watson noted left shoulder pain for the past five months. Dr. Watson noted Herman had the same problem on the right shoulder but had undergone physical therapy. Dr. Watson observed "painful limited motion." Herman was taking ibuprofen. *Id.* Watson observed "almost no ROM. Maybe 20 degrees. Tender about shoulder joint." X-rays were negative. He diagnosed adhesive capsulitis of the left shoulder. Because formal physical therapy was not available to Herman, Dr. Watson formulated a home exercise program for her. AR 243. He injected her left shoulder with Depomedrol and Xylocaine, which provided "complete relief of glenohumeral pain."

### 5. Consultative Examination, Dakota Radiology (Dr. Ronald Baxter) 1/09

Disability Determination Services authorized x rays of Herman's left shoulder, lumbar spine, and right hip in connection with the consultative examination performed by Dr. Craig Mills. The x-rays were interpreted by Dr. Ronald Baxter. The x-rays of Herman's left shoulder showed "mild left sided acromioclavicular joint arthritis" but were otherwise normal. The x-rays of her lumbar spine were normal. The x-rays of her right hip showed no fracture or subluxation, but the pelvis area showed an "old fracture involving the symphisis pubis with a fragment of bone from a prior fracture along the inferior symphysis pubis measuring 2.3 cm in size." AR 226-228.

### 6. Consultative Examination, Black Hills Neurology (Dr. Mills) 1/09

Dr. Craig Mills examined Herman on January 26, 2009 at the request of South Dakota

Disability Determination Services. AR 230. Dr. Mills specializes in rehabilitation, pain management and occupational medicine. *Id.* Herman described her disability to Dr. Mills as beginning with her motor vehicle injury in 1979. She explained she was hospitalized for two or three months. *Id.* She described her present difficulties as hip and low back pain, as well as shoulder pain that migrated. She also described upper extremity pain. She explained that she'd received injections from Dr. Reser when Reser was still practicing with IHS in approximately 2006, but other physicians and physicians assistants had been hesitant to continue with the injections. She noted low back pain on the right that occasionally radiated into her right leg.

Herman reported to Dr. Mills that her last employment was with Prairie Wind Casino but she'd quit because she could not keep up with the physical demands of the work. She reported constant pain, and rated her current pain at an 8/10. She indicated rest, heat, change in position and medication improved her pain level. She also reported fatigue, weakness and swelling of her joints and her back, as well as difficulty walking. AR 230.

Dr. Mills's physical examination revealed Herman was able to move her right shoulder but complained of a dull ache. AR 231. She had a marked limitation of the left shoulder, but was able to move her elbows, wrists and hands "fairly well." Her grasp strength was "fair." Her posture was "stooped." She was able to remove her socks and shoes with her right hand. She had altered sensation in the right calf suggestive of L5 nerve root abnormality. The movement of her toes due to flexion or extension was limited. There was no swelling or edema in the distal lower extremity. Patrick's maneuver of the hips caused irritation, more on the right than the left. Straight leg raise in the seated position was negative. There was no tenderness over the greater trochanteric bursa. She walked with a mildly antalgic gait.

Dr. Mills assessed the following conditions: history of severe motor vehicle trauma with pelvic fracture and ruptured bladder in 1979; history of gestational diabetes; history of right shoulder issues with previous injections by Dr. Reser in 2006; current left shoulder limitations suggestion of frozen shoulder with onset several weeks ago; chronic pain issues related to back, pelvis and possibly

10

hip with suggestion of right L5 intermittent radiculopathy; history of intermittent joint swelling and pain, somewhat migratory, possibly suggestive of an inflammatory arthritis; and tobaccosim.

Dr. Mills believed Herman "may benefit from further medical evaluation for possible inflammatory arthritis given her complaints and migratory joint pain. She has diminished ability to tolerate standing due to pain about the low back and pelvis area and possible L5 radiculopathy complaints. She has difficulties currently with what appears to be a left frozen shoulder. She would benefit from further therapy interventions. She states she will be trying to seek evaluation with Dr. Mark Butterbodt IHS as well."

### 7.    Residual Functional Capacity Assessment, Non-Treating, Non-Examining Physicians(Dr. Kevin Whittle, 1/09, Dr. Frederick Entwistle 1/09)

Dr. Kevin Whittle completed a Residual Functional Capacity Assessment on January 30, 2009. He neither examined nor treated Ms. Herman. AR 215-222. He indicated that "all information is taken from a CE with Dr. Mills on 1/26/09." AR 216. Dr. Whittle opined Herman could occasionally lift 20 pounds, frequently lift 10 pounds, stand 6 hours out of an 8 hour work day, sit 6 hours out of an 8 hour work day, and that her ability to push/pull was unlimited. AR 216. Dr. Whittle opined Herman could frequently climb ramps and stairs, balance; stoop, kneel, crouch, and crawl but could only occasionally climb ladders ropes and scaffolds. AR 217. As evidence supporting his opinion, Dr. Whittle cited Dr. Mills's examination results. AR 216-17. He further opined Herman's ability to handle, finger and feel were unlimited but her ability to reach overhead was limited. He explained that her ability to reach overhead with the left arm was limited to "occasionally" because at the time of her exam, she had a limited range of motion and pain. AR 218. Dr. Whittle assigned no visual, communicative or environmental limitations. AR 218-19.

Finally, Dr. Whittle stated that Herman's "symptoms are attributable to a medically determinable impairment. The severity of the symptoms and their alleged effect on function is consistent with the total medical and nonmedical evidence." AR 220. He opined, however that " the CE report with Dr. Mills reveals more complaints of pain and joint swelling but the objective findings did not reveal a complete picture of this. The left shoulder was the primary problem upon

examination. She appears to be functioning at a light level in her daily activities." AR 220. This opinion is apparently based on Dr. Whittle's observation that Herman "cooks and does all household chores. She shops as needed. She has hobbies and is involved in social activities. She notes limitations in lifting, bending, standing, reaching, walking, sitting and using hands." *Id.* Dr. Whittle acknowledged that there was a medical source statement (Dr. Mills) regarding Herman's physical abilities in the file which was significantly different from his findings. Dr. Whittle indicated he disagreed with Dr. Mills's statement that Herman's ability to stand was diminished due to L5 radiculopathy because Dr. Whittle did not believe the lumbar x-rays or straight leg raise supported those conclusions. AR 221. Dr. Whittle, therefore, believed Herman should be able to sit/stand/walk up to 6 hours out of an 8 hour work day. *Id.*

On May 4, 2009, Dr. Frederick Entwistle (who neither treated nor examined Ms. Herman) entered a one line record in the file which indicated he had "reviewed all the available evidence in the file, and the assessment of 1-30-09 is affirmed as written."

### Hearing Testimony

Only Ms. Herman appeared and testified at the hearing *pro se*. No vocational expert appeared or testified. Ms. Herman was born in 1955 and was fifty-five years old at the time of the hearing. AR 35. She had an associate's degree in general studies. In the past fifteen years, she'd worked as a cashier at a casino, a rental agent, a placement specialist, and a case aide. AR 36. She cited her "arthritis" as the most significant physical problem that prevented her from working. She explained she had "arthritis" in her back, from her head to her toes. She also explained to the ALJ that she got cortisone injections and that she had swelling. AR 36. She also had pain in both shoulders, back and hips. She also had muscle spasms in her legs. AR 36-37. She described her bones and joints as "stiffening up." She had pain every day. She told the ALJ that one of her physicians explained it was a form of rheumatoid arthritis. AR 37. She also described the motor vehicle accident which occurred in 1979 in which she suffered a broken spine and pelvis. AR 37-38. She opined her problems progressed since then. AR 38. She explained she had to wear 'joggers" and she needed help getting dressed. She had seen an orthopedic surgeon who came to Pine Ridge

once a month. AR 38. She believed she continued to have a "frozen" shoulder. AR 39. She could not "windmill" her right arm, nor could she reach over her head. AR 39-40. She could reach forward, but could not reach above her shoulder. AR 40. She had been doing home exercises prescribed by Dr. Watson. *Id.* Herman explained that the IHS Health Center did not have a regular doctor but that she had "periodically" been referred to the orthopedic surgeon in Pine Ridge. AR 41. Her pain was being treated with Motrin and Cortisone injections. AR 41. The injections temporarily numbed the pain. AR 42. The Motrin was effective for temporary relief of the pain and inflammation. *Id.* Physical therapy was helpful. AR 43.

Herman estimated she could sit for an hour and a half before she needed to reposition. AR 43. She could stand for two hours before she got numbness in her legs, especially the right side. She developed low back pain and a limp if she walked too much. AR 43-44. She estimated the maximum amount of weight she could carry at ten pounds. AR 44. She indicated she could not bend over to touch her knees or squat. She could climb a maximum of ten stairs. AR 45. She could push/pull minimally with each arm. AR 45. Her daughter helped her dress and put her hair up. AR 45. She did the dishes and a little housework. AR 46. She explained her daughter "pretty much" took care of her. She swept, cooked, made the bed and did laundry. She explained most of the time she had difficulty doing those things. AR 47. Her daughter usually shopped for her. AR 47. She did not babysit her grand kids because she could not lift them. AR 47.

Herman explained an average day as getting up, taking her Motrin, bathing, then doing her home exercises and physical therapy. Usually her daughter came to fix her breakfast. AR 48. Then she just lounged around unless a family member came to get her. AR 49. Her family described her as "boring." *Id.*

### Third Party Reports

Herman's sister (Monna Patton) completed a "Function Report–Adult) dated October 4, 2008. AR 162-169. She indicated Herman "has trouble" with swelling or stiffness and is in pain and not too active when the weather changes. AR 162. Patton indicated Herman walks, cooks and

13

watches TV with her grandchildren. AR 163. She indicated Herman was physically active before but was no longer able to do things such as bowling, horseshoe tournaments, and volleyball. *Id.* Patton indicated Herman was capable of doing her own dishes and laundry. AR 164. She was no longer athletic. AR 166. She observed that Herman's ability to lift, squat, bend, stand, reach walk, sit, kneel, climb stairs, and use her hands were all affected by her condition. AR 167. She cited "stiffness, swelling, painful" as the manner in which Herman's condition affected those abilities. *Id.* In the section allowed for remarks, Herman's sister wrote:

> Ronda's past injuries–car wreck & arthritic condition seem to affect her especially when the weather changes or fall & winter cool cold weather is here. I've seen her joints swell & become hot & painful to her. If she doesn't eat well she gets incoherent. She may be diabetic or just starting to enter that illness phase.

Ar 169. In the section provided to describe the types of activities Herman engaged in with others, Patton wrote "sit around." AR 166.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) . Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Klug v. Weinberger*, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted). In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. *Woolf*, 3 F.3d at 1213. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. *Id.* If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. *Oberst v. Shalala*, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a

reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." *Mittlestedt v. Apfel*, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

Additionally, when the Appeals Council has considered new and material evidence and declined review, the Court must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence. *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003).

The court must also review the decision by the ALJ to determine if an error of law has been committed. *Smith v. Sullivan*, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. *Walker v. Apfel*, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. *Smith*, 982 F.2d at 311.

**B.    The Disability Determination and The Five Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511. The ALJ applies a five step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. *Smith v. Shalala*, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. When a determination that an applicant is or is not disabled can be made at any step, evaluation under a subsequent step is unnecessary. *Bartlett v. Heckler*, 777 F.2d 1318, 1319 (8th Cir. 1985). The five steps are as follows:

> **Step One:**    Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

**Step Two:** Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three:** Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. *Bartlett v. Heckler*, 777 F.2d 1318, 1320 at n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. *Heckler v. Campbell*, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 404.1520a(c)(2).

**Step Four:** Determine whether the applicant is capable of performing past relevant work (PRW) as defined by 20 CFR 404.1560(b)(1). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five:** Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

## C.    Burden of Proof

The Plaintiff bears the burden of proof at Steps One through Four of the Five Step Inquiry. *Barrett v. Shalala*, 38 F.3d 1019, 1024 (8th Cir. 1994); *Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000); 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at Step Five. "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but

instead, originates from judicial practices." *Brown v. Apfel*, 192 F.3d 492, 498 (5ᵗʰ Cir. 1999). The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." *Walker v. Bowen*, 834 F.2d 635, 640 (7ᵗʰ Cir. 1987).

### D.    The ALJ's Decision

The ALJ issued a ten page, single-spaced decision on September 24, 2010.  The ALJ's decision discussed steps one through four of the above five-step procedure.

At step one, the ALJ found Herman had not engaged in substantial gainful activity since her alleged onset date (June 16, 2008). AR 21.

At step two, the ALJ found Herman has the following severe impairments: Chronic pain left shoulder and chronic pain of the right hip. AR 21.  The ALJ found that although Herman claimed to have a diabetic condition, she had not met her burden of proof in establishing that she did suffer from diabetes.  AR 22.  The ALJ also rejected Herman's other various claims due to arthritis, tendinitis, back problems, sleep problems, and skin problems.  AR 22.

At step three, the ALJ indicated he considered whether Herman is disabled under Listings 1.00 (impairments of the musculoskeletal system).  The ALJ found, however that there was no objective medical evidence that Herman lacked the ability to ambulate effectively on a sustained basis or that she lacked the ability to perform fine and gross movements effectively on a sustained basis.  AR 22.  As such, the ALJ found that Herman does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Supbart P, Appendix 1.  AR 22-23.

At step four, the ALJ found Herman has the residual functional capacity (RFC) to perform light work with the following limitations:  she can occasionally climb ladders/ropes/scaffolds and frequently climb ramps/stairs, balance, stoop, kneel, crouch, or crawl, and she has no visual, manipulative, communicative or environmental limitations.  AR 23.  The ALJ adopted the RFC as

defined by the non-examining, non-treating DDS physician (Dr. Whittle) (AR 23). The ALJ found Herman's statements concerning the intensity, persistence, and limiting effects of her symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment as assigned by the non-examining, non-treating DDS physician. AR 26. The ALJ stated "the above residual functional capacity . . .is supported by the objective medical evidence in the file." AR 27.

The ALJ determined Herman is capable of performing her past relevant work as a gambling cashier. AR 27. "This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565)." AR 27. The ALJ acknowledged that the cashier job is generally performed at the sedentary level, although it was "heavy as described by claimant." AR 27. The ALJ mistakenly asserted Herman had not submitted an actual job description from her employer. *Id.* There is, however, a job description contained in the administrative record which describes the cage cashier job at Prairie Wind Casino as requiring the ability to lift 50 pounds and "heavy lifting on a daily basis" and "heavy pulling pushing" as essential functions of the job. *See* AR 188.

Because the ALJ determined at Step Four that Herman remains capable of performing her past relevant work as a casino cashier, the ALJ did not proceed to Step Five of the analysis. The ALJ decided that Herman is "not disabled" under the Social Security Act. AR 28.

## E. **The Parties' Positions**

Herman assigns four points of error: (1) the ALJ failed to identify all of her severe impairments; (2) the ALJ failed to develop the record for an unrepresented Claimant; (3) the ALJ failed to assess credibility in accordance with legal standards; and (4) the ALJ's residual functional capacity assessment was inadequate. The Commissioner asserts his decision is supported by substantial evidence on the record and should be affirmed.

**F.    Analysis**

Herman asserts the ALJ made four mistakes:    (1) He failed to identify all of her severe impairments, (2) he failed to adequately develop the record; (3) he failed to adequately assess her credibility; and (4) he failed to properly formulate her residual functional capacity. These assertions will be examined in turn, but not in same order presented in Herman's brief.

### 1.    Whether the ALJ Adequately Developed the Record

This point of error is addressed first, because it is potentially a dispositive, reversible error. *See Cox v. Apfel*, 160 F.3d 1203, 1209 (8th Cir. 1998). An inadequately developed record infects the entire process  because an inadequate record prohibits the ALJ from properly determining, at every Step of the Five Step Procedure,  whether Herman is disabled.  In *Cox*, the Eighth Circuit reversed and remanded the case to the agency for further proceedings.  *Id.* at 1210.  The Court discussed the claimant's primary assignment of error (the credibility determination) and determined it was critically flawed.  *Id.* at 1207-08.  The Court noted, however, that

> Many of the inadequacies of the ALJ's decision flow from his failure to develop the record. The administrative hearing is not an adversarial proceeding. The ALJ has a duty to develop facts fully and fairly, and this duty is enhanced when the claimant is not represented by counsel. The record presented is inadequate for the purpose of determining whether Cox is disabled.

*Id.* at 1209. The Eighth Circuit reversed and remanded because "it is obvious that the record did not contain all the relevant medical records . . .[a]nd the record clearly did not contain enough evidence to adduce the impact of Cox's morphine dependence on her ability to work, or whether Cox still suffered from edema . . ."    The Court held the ALJ's failure to properly develop the record constituted reversible error.  *Id.* at 1210.

Herman asserts the ALJ failed to adequately develop the record because (1) the ALJ's own analysis acknowledged the incompleteness of the medical evidence for purposes of adequately determining disability, and; (2) because the ALJ ignored both the opinions and the recommendation of the consulting physician (Dr. Mills) for further investigation of her disability. The Court agrees.

During the hearing, Herman attempted to explain to the ALJ that there are not regular

physicians at the IHS Clinic in Kyle, and that in order to see specialists she needed a referral. *See* AR at 40. The ALJ, however, was not receptive to Herman's explanations about her limited ability to obtain medical treatment with physicians or specialists. *See e.g.* AR 38, 40-41.[19] Additionally, the DDS purchased a consultative examination (Dr. Mills). Dr. Mills opined that Herman's ability to work was limited by her low back pain and possible L5 radiculopathy. Dr. Mills recommended further medical evaluation for possible inflammatory arthritis and migratory joint pain. He also recommended further therapy interventions. Herman's physical ability to work, a clear diagnosis for her low back pain/possible L5 radiculopathy, and arthritic/migratory joint pain problems are crucial issues in this case.

In light of Herman's limited access to health care and her *pro se* status, the ALJ had a heightened duty to develop the record. *See Cox, id.* at 1209; *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). "The ALJ does not have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped." *Vossen, id.* at 1016. (Emphasis in original). In *Vossen* as here, instead of developing the record the ALJ "relied on the opinion of a non-treating, non-examining physician. The opinions of such a physician do not normally constitute substantial evidence on the record as a whole."

---

[19]Herman tried to explain that the orthopedic surgeon was a contracted service that was not regularly available and that she could not always get in to see him. AR 38. She also tried to explain that her financial resources did not allow her to travel elsewhere for her medical care. *Id.*

In response to Herman's explanation about the need for a referral for treatment of her "frozen shoulder" and stiff fingers, the ALJ said "you're talking–you're getting away from me–to where I'm–you're talking but you're not giving me information I could use." AR 40.

On the next page of the transcript, Herman tried again to explain after the ALJ asked her whether it was the ortho specialist or the IHS physician who instructed her to do exercises for her frozen shoulder: "It's both. They referred me out. They referred me to the ortho surgeon in Pine Ridge." AR 41. Herman continued after the ALJ inquired whether Dr. Reser was with IHS: "She. Yes. Okay, we get referred to like different ones, whoever is on duty. They don't have a regular medical doctor. It's a health center. And different ones, five different doctors has quoted me as , you know, like, 'well, we're going to send you here.' So I go to the ortho surgeon periodically in Pine Ridge." AR 41.

In his written decision, the ALJ ignored both Herman's stated difficulties in obtaining care and Dr. Mills's recommendations, but at the same time criticized Herman's lack of treatment (AR 24) and the sufficiency of the medical opinions (AR 26,[20] 27) required to prove Herman's claim for disability benefits.

"Even when the plaintiff validly waives the right to counsel, because benefit proceedings are non-adversarial in nature, the ALJ must affirmatively develop the record. And the ALJ has an even greater responsibility to develop the record where claimants proceed *pro se*." *Valoy v. Barnhart*, 2004 WL 439424 (S.D.N.Y.) at *6. The *Valoy* case is not binding precedent in the District of South Dakota, but it is persuasive for a couple of reasons. First, the claimant in *Valoy* was a *pro se* claimant who was proceeding under a disadvantage, although her disadvantage was different than Herman's. Second, *Valoy* emphasizes the ALJ's duty to develop the record regarding the records and opinions of the treating physician.

In this case the ALJ emphasized "none of [Herman's] treating medical sources ... stated she is not able to work on a full time basis." AR 27. As in *Valoy*, however, neither the ALJ nor anyone else ever asked the treating physicians for their opinions on this crucial issue.

[P]articularly when the *pro se* plaintiff is handicapped by poor health and limited language skills,[21] the ALJ must make a searching investigation of the record in order

---

[20]The ALJ acknowledged that the physician's assistant diagnosed "probable fibromyalgia" but dismissed the diagnosis because "there was no trigger point analysis indicated in the notes." AR 26. Additionally, despite ignoring Dr. Mills's recommendation for a referral to further evaluate Herman's inflammatory arthritis and complaints of migratory joint pain (i.e. fibromyalgia) the ALJ rejected Herman's claim based on "no laboratory findings of arthritis or illness. There are no consistent findings of joint swelling or inflammation." AR 27. And finally, although there is no evidence a request for such an opinion was ever made, the ALJ stated "none of her treating medical sources has stated she is not able to work on a full time basis." AR 27.

[21]In this case, Herman was not disadvantaged by her lack of education, but by her lack of access to medical care. The problem was compounded when the DDS requested a consultative examination, but then ignored both the results of the examination and the recommendations of

to fill any clear gaps in the administrative record. In such cases the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. If the clinical records are inadequate, the ALJ has the duty to seek additional information.

\*\*\*

The ALJ's responsibility to assist a claimant has particular import in light of the well-established treating physician rule, which requires an ALJ to grant significant weight to the opinions of the treating physicians. The duty to develop a full record and to assist a *pro se* plaintiff compels the ALJ to obtain from a treating source expert opinions as to the nature and severity of the claimed disability and to make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of that treating physician as to the existence, the nature, and the severity of the claimed disability.

\*\*\*

In the medical subpoenas, the ALJ failed to request that the treating physicians submit reports on Valoy's asserted disability and in particular, their perspective as to her fitness for employment. As a result, the physicians did not include such information.

\*\*\*

Defendant argues that because the ALJ subpoenaed all available medical records from most of Valoy's treating physicians, the record was 'complete' and therefore no further duty to supplement the record attached. However, in light of the importance of the treating physician's opinion about the claimant's functional capacity, . . .defendant's definition of 'complete' is misguided. The ALJ could simply have added to the language of the subpoena a request that the physicians either comment on the claimant's asserted disability and in particular her functional capacity, or else demand that the physician complete an attached questionnaire (functional capacity or psychiatric capacity assessment) similar or better yet identical to the one completed by the consulting physicians.

*Valoy. Id.* at \*7-8 (punctuation altered, citations omitted).

It is possible that because of the inconsistency of physician coverage at the Kyle Clinic where Herman received her regular medical care and Herman's sporadic ability to actually receive treatment with the specialists to whom she was referred, that it will not be possible to obtain an

---

the examiner (Dr. Mills).

opinion from a treating physician. Herman's pro se status and the inadequacy of the medical record in this case, however, triggered the ALJ's heightened duty to more fully develop the record in this instance.

On remand, the ALJ should request opinions from the treating physicians regarding Herman's residual functional capacity and follow the recommendations of the consulting physician (Dr. Mills) to: (1) obtain further medical evaluation from an appropriate specialist for possible inflammatory arthritis regarding Herman's complaints and migratory joint pain; and (2) obtain clarification from Dr. Mills or another medical specialist regarding what further "therapy interventions" Herman needs to address her low back and pelvis area and possible L5 radiculopathy complaints as well as her "frozen shoulder" complaints.

### 2. Whether the ALJ Identified All of Herman's Severe Impairments

Herman's next assignment of error is that the ALJ failed to identify all of her severe impairments. The ALJ identified two severe impairments: chronic left shoulder pain and chronic right hip pain. Herman asserts, however, that the ALJ mistakenly identified symptoms, rather than medically determinable impairments. Specifically, Herman asserts the underlying medically determinable impairments were a frozen left shoulder and a pelvic fracture with residual fracture fragment rather than "chronic pain " of the left shoulder and right hip.[22] She also asserts the ALJ failed to recognize the following severe impairments: untreated cholelithiasis, sciatica, back pain, right shoulder pain,[23] and fibromyalgia. Herman alleges that because the ALJ failed to identify these severe impairments, his credibility assessment, RFC formulation, and Step Four assessment were all flawed.

First, the ALJ's failure to fully develop the record necessarily prevented him from accurately

---

[22]*See* 20 C.F.R. § 404.1528 (symptoms are not enough to establish impairment); SSR 96-4 (explaining that a symptom is not a medically determinable impairment).

[23]According to Herman's first criticism, the underlying condition rather than the symptom (back and shoulder pain) should be identified as the impairment.

assessing Herman's severe impairments. *Cox v. Apfel*, 160 F.3d 1203, 1209 (8th Cir. 1998). After the Commissioner has obtained the opinions of the treating physicians and followed the recommendations of the consulting physician on remand, Herman's impairments, severe and non-severe will be reviewed anew.

"It is the claimant's burden to establish that his impairment or combination of impairments are severe." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). A severe impairment is defined as one which significantly limits a physical or mental ability to do basic work activities. 20 C.F.R. § 1521. A impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby, Id.* "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id.* (citation omitted). Additionally, the duration requirement must be met. The impairment must have lasted at least twelve months or be expected to result in death. *See* 20 C.F.R. § 404.1509.

Herman's gallstones (cholelithiasis) do not meet the duration requirement because the record shows the gallstones were diagnosed in June, 2010 and surgery was scheduled for November, 2010. AR 264, 267. There is no indication in the record that the surgery was not performed as scheduled.

The remaining potential severe impairments (frozen right shoulder, sciatica/back pain and arthritis/fibromyalgia), however, are terms which appear frequently throughout Herman's medical records and which meet the duration requirement. *See e.g.* AR 231, 234, 236, 237, 238, 239, 241, 247, 249, 261, 263, 265, 267. "Failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal." *Spicer v. Barnhart*, 64 Fed. Appx. 173, 178 (10th Cir. 2003). *See also, Washington v. Shalala*, 37 F.3d 1437, 1439-40 (10th Cir. 1994) ("failure to apply the correct legal standard . . . is grounds for reversal. We note that the ALJ failed to consider the Plaintiff's vision loss in conducting the step-four inquiry. This failure, alone, would be grounds for reversal.").

After Herman has received the appropriate evaluation and therapy as recommended by Dr. Mills, the Commissioner should re-evaluate whether any of the other impairments alleged by her qualify as "severe" pursuant to 20 C.F.R. § 1521.

### 3. The Commissioner's Evaluation of the Herman's Subjective Complaints (The Credibility Determination)

Herman asserts the ALJ did not appropriately apply the Polaski factors (as explained in Social Security Ruling 96-7) to evaluate her subjective complaints when determining her residual functional capacity. "Where adequately explained and supported, credibility findings are for the ALJ to make." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000). If the ALJ's credibility determination is supported by substantial evidence, that the reviewing judge may have decided differently is not justification for reversal. *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004). The ALJ's credibility finding must only be supported by "minimally articulate reasons for crediting or rejecting evidence of disability" *Id.* This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Ordinarily, credibility determinations are peculiarly for the finder of fact. *Kepler v. Chater*, 68 F.3d 387, 391 (8th Cir. 1995). Findings as to credibility, however, should be closely and affirmatively linked to substantial evidence and "not just a conclusion in the guise of findings." *Id.* The ALJ must articulate specific reasons for questioning the claimant's credibility where subjective pain is a critical issue. *Id.* Thus, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the Plaintiff's complaints. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).

When evaluating evidence of pain, the ALJ must consider: (1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions. *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir.

2004) *citing Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). *See also* 20 C.F.R. § 1529. The ALJ may not reject a claimant's subjective pain complaints solely because the objective medical evidence does not fully support them. *Polaski* at 1320. The absence of objective evidence is merely one factor to consider. *Id.*

When a Plaintiff claims the ALJ failed to properly consider her subjective pain complaints, the duty of the Court is to ascertain whether the ALJ considered *all* of the evidence relevant to the Plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. *Masterson*, 363 F.3d at 738-39 (emphasis added). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all the evidence. *Id.*

In his decision, the ALJ cited *Polaski* and mentioned 20 C.F.R. § 404.1529 and indicated he had considered those factors, along with SSR 96-4 and 96-7p. *See* AR 23. The task for the Court, therefore, is to determine whether the ALJ properly considered all the record evidence when he determined Herman's pain complaints "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." AR 26.

> SSR 96-7p instructs:
>
> It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the statements and the reasons for that weight.

"In rejecting a claimant's complaints of pain as not credible, we expect an ALJ to detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Guiilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (punctuation altered).

In his decision, the ALJ stated he had considered the necessary factors pursuant to 20 C.F.R.

§ 404.1529 and SSR 96-7p. The ALJ then stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

AR 19. This boilerplate language has been harshly criticized by other courts as "unhelpful, " "opaque," and "meaningless." *See Adams v. Astrue*, 2012 WL 3065299 (N.D. Ill.) at *9. (Citing cases). And it "backwardly implies that the ability to work is determined first and is then used to determine the claimant's credibility. More importantly, it fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony." *Id.* (citations omitted, punctuation altered). In this instance, the ALJ did not sufficiently "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (punctuation altered).

In the paragraphs preceding and following this conclusion, the ALJ discussed at any length only two of the factors mentioned in 20 C.F.R. § 404.1529 (one of which was Herman's activities of daily living) and he did not sufficiently explain how this factor affected the credibility determination. Instead, the ALJ recounted that

> The claimant testified that she had pain with virtually any and all activities. She said that she could not bend over and touch her knees. She had pain with doing the dishes. Her daughter helps her with her hair. She could not reach overhead with her left arm. She can do laundry and cook. She asserted that she could climb about 10 stairs at one time. She did not know how far she could walk. The claimant was taking Motrin 800 for inflammation and receiving Cortisone for joint pain. The claimant completed a function report in October 2008. She was living with family at that time. She was able to do her own personal care with pain and stiffness. She could do her own household chores, laundry, ironing, mowing and yardwork. The claimant would go outside daily. She did her own shopping and handled her own finances. The claimant would watch tv and read for hobbies. The claimant would spend time with others. She would go to the store, to craft nights, and to meetings on a regular basis. She had back pain, wrist and elbow pain, and shoulder pain. She could follow written and spoken instructions well. Her illness affected her ability to lift, bend, stand, reach walk, sit, and use her hands. She could handle changes in routine well and could handle stress.

27

*See* AR at 26-27.

The Eighth Circuit has repeatedly chastised the Social Security Administration, however, for equating an ability to feed and bathe oneself with the capability to perform substantial, gainful activity.

> In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individual's strengths and weaknesses. SSR 85-16. SSR 85-16 further specifies that 'consideration should be given to . . . the quality of daily activities . . [and the] ability to sustain activities, interests, and relate to others *over a period of time* ' and that the 'frequency, appropriateness, and independence of the activities must also be considered.'
>
> After mentioning several of [the claimant's] activities such as fixing meals, watching movies, checking the mail, and doing laundry, the ALJ noted that [the claimant's] 'ability to perform them to any degree is inconsistent with her allegations of constant, debilitating symptoms.' . . . [Claimant's] testimony about her symptoms hardly seems inconsistent with her ability to perform such routine and simple daily living activities 'to any degree.' Moreover, it is well-settled that a 'claimant need not prove she is bedridden or completely helpless to be found disabled.'
>
> [T]his court has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work. *How many times must we give instructions that watching television, visiting friends and going to church do not indicate that a claimant is able to work full time in our competitive economy? .. The ALJ's failure to consider the quality, frequency and independence of these activities . . .render suspect the use of these activities as probative evidence of [the claimant's] ability to work.* Since a claimant need not prove she is bedridden or completely helpless to be found disabled, the import of [the claimant's] ability to carry out daily activities must be assessed in light of the record supported limitations on her ability to perform real world work.

*Reed v. Barnhart*, 399 F.3d 917, 922-23 (8th Cir. 2005) (citations omitted, punctuation altered, emphasis added). Similarly, that Herman is able to dress and bathe herself, (with reported significant pain and the help of her daughter) shop for groceries, and do her laundry "provides little or no support for the finding that she can perform full-time competitive work." *Id.* at 923.

The other reason offered by the ALJ for finding Herman not credible was the ALJ's finding that she did not follow through with physical therapy and home exercise programs and the lack of objective medical evidence to support her claims of arthritis or inflammatory illness.

First, the ALJ's finding that Herman did not follow through with her physical therapy and has not complied with home exercise is incorrect. The medical records indicate that physical therapy was either unavailable or discontinued (AR 237, 243) and Herman testified that as of date of her hearing, home exercises remained a part of her daily routine. AR 48. There is no contradictory evidence in the record.

The ALJ also discounted Herman's credibility because of the lack of objective medical evidence (specifically "no laboratory findings of arthritis or inflammatory illness" (AR 27) and "no consistent findings of joint swelling or inflammation" )(AR 27) but these shortcomings are the result of the ALJ's own failure to develop the record. *See* Section 1 above. For this reason as well, the Commissioner's credibility finding is not supported by substantial evidence.

### 4. The ALJ's Determination of Herman's RFC

The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) *abrogation on other grounds recognized in Higgins v. Apfel*, 222 F.3d 504 (8th Cir. 2000). Herman correctly notes the ALJ's formulation of the RFC was inconsistent with his own findings, and with the findings of the physician whose opinion he purportedly adopted. Specifically, Herman notes that although the ALJ adopted the opinion of Dr. Whittle, who opined Herman could only "occasionally" reach overhead, the ALJ failed to incorporate this limitation in his RFC. "[T]he ALJ must not substitute his opinions for those of the physician." *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).

It is also noted that the ALJ adopted the RFC which was based on the opinion of Dr. Whittle, the non-treating, non-examining physician. In his report, Dr. Whittle stated that 'all information is taken from a CE[24] with Dr. Mills on 1/26/09." Later in his report, however, Dr. Whittle acknowledged that Dr. Mills's conclusions about Herman's physical restrictions were "significantly different" from his own. Dr. Mills recommended further treatment and therapy but those recommendations were not followed. Instead, Dr. Whittle, who had never seen or treated Herman,

[24]Consultative Exam

rejected Dr. Mills's findings and recommendations but nonetheless cited Dr. Mills's examination as the basis for his more strenuous residual functional capacity assessment. "[O]pinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." *Bowman v. Barnhart*, 310 F.3d 1080, 1085, (8ᵗʰ Cir. 2002). For this reason as well, the RFC adopted by the ALJ is not supported by substantial evidence.

## CONCLUSION

For the reasons more thoroughly explained above, it is respectfully recommended that the Plaintiff's Request for Relief in her Complaint (Doc. 1) be GRANTED, and that the Commissioner's denial of benefits be REVERSED and REMANDED.

42 U.S.C. § 405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration. It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands. A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling. *Buckner v. Apfel*, 213 F.3d 1006, 1010 (8ᵗʰ Cir. 2000). A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings. *Id.* Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." *Buckner*, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. *Id., Cox v. Apfel*, 160 F.3d 1203, 1210 (8ᵗʰ Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. *See also Taylor v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate. It is respectfully RECOMMENDED to the District Court, therefore, that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986).

Dated this __8__ day of January, 2013.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, Clerk

By _____, Deputy

31